**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-13-0000028**
**25-FEB-2014**
**08:36 AM**

NO. CAAP-13-0000028

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

LEIGH K. MATSUYOSHI and L.K. MATSUYOSHI, INC.,
Respondents-Appellants-Appellants,
v.
BUSINESS REGISTRATION DIVISION, SECURITIES
ENFORCEMENT BRANCH, OFFICE OF ADMINISTRATIVE
HEARINGS, DEPARTMENT OF COMMERCE AND CONSUMER
AFFAIRS, STATE OF HAWAIʻI,
Petitioner-Appellee-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 12-1-0604)

MEMORANDUM OPINION
(By: Nakamura, C.J., Foley and Leonard, JJ.)

Respondents-Appellants-Appellants Leigh K. Matsuyoshi
(**Matsuyoshi**) and L.K. Matsuyoshi, Inc. (**LKM Inc.**) (together,
**Appellants**) were found to have violated several provisions of the
Uniform Securities Act, Hawaii Revised Statutes (**HRS**) Chapter 485
(**Securities Act**), in an action brought by Petitioner-Appellee-
Appellee Business Registration Division, Securities Enforcement
Branch, Office of Administrative Hearings, Department of Commerce
and Consumer Affairs, State of Hawaiʻi[1] (**Appellee**).

Appellants appeal from:

(1) the "Order Affirming Commissioner's Final Order"
and the "Final Judgment," (together, **Circuit Court Order**) both

---

[1] At the time relevant to this case, the Uniform Securities Act
(Modified) was codified as HRS Chapter 485. Effective July 1, 2008, HRS
Chapter 485 was repealed and replaced with a new Uniform Securities Act
codified as HRS Chapter 485A. 2006 Haw. Sess. Laws Act 229, §§ 17, 20 at 996.
We cite to HRS Chapter 485, which contains the provisions relevant to this
case.

entered December 18, 2012 in the Circuit Court of the First Circuit[2] (**Circuit Court**);

(2) the "Commissioner's Final Order as to Respondents [Matsuyoshi] and [LKM Inc.]" (**Final Order**) entered February 3, 2012 in the Department of Commerce and Consumer Affairs, Hearings Office[3] (**DCCA**); and

(3) the "Hearings Officer's Findings of Fact, Conclusions of Law and "Recommended Order" (**Recommended Order**) entered October 20, 2010 in the DCCA.[4]

On appeal, Appellants contend the Circuit Court Order was wrong because:

(1) the Commissioner clearly erred by misapplying the doctrine of Piercing the Corporate Veil against Appellants to conclude the subject transactions were not exempted from the securities' registration requirement of HRS § 485-8 (Supp. 2000);

(2) the Commissioner clearly erred by misapplying the doctrine of Piercing the Corporate Veil against Appellants to conclude Matsuyoshi violated the registration regulations for investment advisors and salespersons under HRS § 485-14 (Supp. 2000);

(3) the Commissioner clearly erred by concluding Appellants violated 485-25(a)(1), (2), and (3) (Supp. 2007) because the record lacked sufficient evidence to find either Matsyoshi or LKM Inc. committed fraud, and the conclusion was based on the erroneous finding that Appellants were not exempted from the registration regulations under the Securities Act; and

(4) the Commissioner violated Appellants' Fourteenth Amendment due process rights by "sua sponte" misapplying "a major doctrine of law in the Final Order without allowing Appellants a meaningful opportunity to respond."

## I. BACKGROUND

Matsuyoshi was a registered representative of Paulson

---

2       The Honorable Rhonda A. Nishimura presided.

3       Tung Chan, Commissioner of Securities (the Commissioner) presided.

4       Craig H. Uyehara, Administrative Hearings Officer (Hearings Officer Uyehara) presided.

Investment Company (**Paulson**) from May 1992 to June 19, 2000. Ray Ishihara (**Ishihara**), Shizue Takaki (**Takaki**), and Miyuki Hirashima (**Hirashima**), former clients of Matsuyoshi while she was at Paulson (collectively, **Investors**), invested in LKM Inc. Matsuyoshi incorporated LKM Inc. on June 7, 2000, to invest in stocks. Matsuyoshi was the sole director, president, vice-president, treasurer, registered agent, manager and only employee of LKM Inc. and had full control of the company from 2000 through 2004.

LKM Inc. issued "Stock Purchase Agreements" (**SP Agreements**) to each of the Investors. The SP Agreements purported to sell Class A Common Stock in LKM Inc. to the Investors in exchange for a collective capital contribution of almost one million dollars. Matsuyoshi testified LKM Inc. never issued stock certificates. The SP Agreements provided that Matsuyoshi was entitled to a salary of 7% of LKM Inc.'s total equity per month. This salary would equal 84% of LKM Inc.'s assets at the beginning of the year, if the asset level had remained constant. Matsuyoshi deposited the Investors' total contribution into LKM Inc.'s business brokerage account held at Charles Schwab (**Schwab Account**). Matsuyoshi testified that the total value of the Schwab Account was equal to the total equity of LKM Inc. From June 2000 to November 2004, Matsuyoshi issued around $486,000 to herself and her creditors directly from LKM Inc.'s Schwab Account.

Matsuyoshi testified she alone made the investment decisions concerning LKM Inc.'s Schwab Account. LKM Inc.'s Schwab Account decreased in value as early as October of 2000. Around that time, Matsuyoshi returned Takaki's money following Takaki's repeated requests. Takaki received about $15,000 less than she initially invested. In 2002, Matsuyoshi returned Ishihara's money at his request. Ishihara received about $320,000 less than he originally invested. By 2004, Matsuyoshi returned Hirashima's investment, which was about $287,000 less than Hirashima originally invested.

On August 14, 2009, the Commissioner issued a "Preliminary Order to Cease and Desist" against Appellants

alleging Appellants engaged in unregistered and fraudulent securities sales and solicitations through the offer and sale of the SP Agreements. The DCCA heard the matter on October 22, 2009 and March 16, 2010, and Hearings Officer Uyehara issued the Recommended Order on October 20, 2010. The Recommended Order recommended the Commissioner "conclude that the preponderance of the evidence established that [Appellants] violated HRS §§ 485-8, 485-14, 485-25(a)(1), (2), and (3)[.]"

On February 3, 2012, the Commissioner issued the Final Order. The Final Order affirmed the part of the Recommended Order that found a preponderance of evidence established: (i) Appellants violated § 485-8 by not registering the securities involved in the SP Agreement; (ii) Matsuyoshi violated § 485-14 by acting as an unregistered salesperson and investment advisor; and (iii) Appellants violated § 485-25(a)(1), (2), and (3), by engaging in fraudulent and other prohibited activities. The Final Order reversed the part of the Recommended Order that found LKM Inc. violated § 485-14 and affirmed the recommended $500,000 penalty. On December 18, 2012, the Circuit Court affirmed the Final Order.

## II. STANDARD OF REVIEW

"Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal." Paul's Electrical Service, Inc. v. Befitel, 104 Hawaiʻi 412, 416, 91 P.3d 494, 498 (2004). We review such a decision to determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) to the agency's decision. See id. HRS § 91-14(g) (2012 Repl.) provides:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or

(4)     Affected by other error of law; or

(5)     Clearly erroneous in view of the reliable,
        probative, and substantial evidence on the whole
        record; or

(6)     Arbitrary, or capricious, or characterized
        by abuse of discretion or clearly
        unwarranted exercise of discretion.

Findings of fact are reviewed under § 91-14(g)(5). <u>See</u> <u>id.</u> Conclusions of law are reviewed under §§ 91-14(g)(1), (2), and (4). <u>See</u> <u>id.</u> An agency's exercise of discretion is reviewed under § 91-14(g)(6). <u>See</u> <u>id.</u>

### III.  DISCUSSION

### A.  Appellants' violated HRS § 485-8.

The finding that the SP Agreements constitute securities under the Securities Act is undisputed on appeal. Under HRS § 485-8, securities are required to be registered with the office of the commissioner unless an exception applies. Appellants contend the subject transactions were exempted under HRS § 485-6(9) (Supp. 2001) (limited offering exemption[5]), which provides:

> **§ 485-6(9) Exempt Transactions.**  The following transactions shall be exempt from sections 485-4.5, 485-8, and 485-25(a)(7):
>
> . . . .
>
> (9)  Any transaction pursuant to an offer to sell securities of an issuer, if the transaction is part of an issue which:
>
> (A) There are no more than twenty-five offerees, wherever located (other than those designated in paragraph (8)) during any twelve consecutive months;
>
> (B) The issuer reasonably believes that all purchasers, wherever located, (other than those designated in paragraph (8)), are purchasing for investment;
>
> (C) <u>No commission, discount, or other remuneration is paid or given, directly or indirectly, to a person, other than a dealer or agent registered under this chapter, for soliciting a prospective purchaser in this State;</u>

---

[5]     The fundamental objective of the limited offering exemption, HRS § 485-6(9), is "to provide a relatively simple and economical procedure for small businesses to raise venture capital, either in the organizational state, or as a means of raising additional capital from a small number of investors." David F.E. Banks, <u>Hawaii's Response to Regulation D</u>, Hawai'i Bar Journal, 1991, at 1, 17, n. 133.

and

> (D) The securities of the issuer are not offered
> or sold by general solicitation or any general
> advertisement or other advertising medium[.]

(Emphasis added.)[6]  The question before the Commissioner was whether the 7% "salary" Matsuyoshi was to receive under the SP Agreements constituted remuneration for soliciting the sale of corporate stock to the three Investors.  The Commissioner concluded:

> In the case before us, the undisputed facts are that [Matsuyoshi's] compensation was directly keyed to the Investors' investments.  The "salary" was stated as a percentage of the corporate equity and [Matsuyoshi] testified that the corporate equity was the same thing as the Investors investments.  So for all intents and purposes, her "salary" was a percentage of investments she solicited and brought to the company, making the salary at least indirect, if not direct, renumeration [sic] for her efforts in successfully soliciting the Investors.

> The question then is, can [Matsuyoshi], the salesperson, disclaim the compensation as belonging to [Matsuyoshi], the manager of investments, protected under the veil of the corporate structure?

> It is well-established in Hawaii jurisprudence that where an individual acts in every role of a corporation, she is the alter ego of the corporation and the fiction of recognizing the corporation as a distinct entity may be disregarded to prevent injustice and inequity. <u>Kalihi, Inc. v. Yamamoto</u>, 54 Haw. 267, 271-2, 506 P.2d 9, 12 (1973). Essentially, such a corporation should be disregarded for the purpose of stopping the individual from circumventing the laws of justice.

> In the case before us, there could not be a thinner corporate veil to pierce. The facts are undisputed that [Matsuyoshi] held every role in the corporation, from incorporator, to agent, to president, vice-president, secretary, treasurer, sole director, manager, sole employee.

---

[6]    The text of § 485-6 in effect in 2000 provided:

(9) Any transaction pursuant to an offer directed by the offerer to not more than twenty-five persons (other than those designated in paragraph (8)) in the State during any period of twelve consecutive months, whether or not the offerer or any of the offerees is then present in the State, if all buyers represent that they are purchasing for investment (rather than with a present view to resale) and the seller reasonably accepts their representations as true, <u>and no commission or other remuneration is paid or given directly or indirectly for soliciting any prospective buyer</u>[.]

HRS § 485-6 (1993) (emphasis added).  The relevant portion of the exemption is effectively the same as the 2001 version.  The 2001 version has been used throughout the proceedings below and we reference this version in the interest of continuity.

She was responsible for the sales and solicitation of the shares of the company to the Investors and she controlled the investment of all the funds that came in from those same investors. The corporate veil was so thin that Respondent Matsuyoshi herself testified the Investors' funds were identical to the "corporate equity." In this case, to allow [Appellants] to use their corporate veil to protect themselves from the consequences of their own schemes would bring about injustice and inequity.

Moreover, the "salary" for management of investments of 7% of assets under management per month would amount to 84% per year, a compensation so high and out of norm, that it is more than likely by the preponderance of the evidence that the compensation conflated salesperson and investment adviser and/or investment adviser representative renumeration [sic] into one. The fact that Respondent Matsuyoshi structured the entire enterprise around herself in every role supports that conclusion as well.

Piercing through the corporate veil, the Commissioner concludes Respondent Matsuyoshi's "salary" was keyed off of the 7% of the amount of investments she solicited on behalf of the company and constitutes in part renumeration [sic] for solicitation of the securities. Accordingly, [Appellants] have failed to prove they have met element (C) and the securities do not qualify for the exemption under HRS § 485-6(9).

The burden of establishing an exemption is on the person claiming the benefit of the exemption and it "shall not be necessary to negate any of the exemptions in this chapter provided in any complaint, information, indictment, or any other writ or proceedings laid or brought under [the Securities Act]." HRS § 485-17 (1993). Appellants contend the remuneration contemplated by the limited offering exception is limited to value directly received in exchange for the solicitation activities: "Did [Matsuyoshi] receive remuneration in exchange *for soliciting* the [SP Agreements]? No, she did not." This contention contravenes the plain language of HRS § 485-9(c) that remuneration may be direct or indirect. See HRS § 485-9(c). Matsuyoshi was required, and failed, to prove she did not receive direct or indirect remuneration for soliciting the sale of securities.[7]

---

[7] While the remuneration limitation of § 485-9(c) is not designed to prevent salaried employees or officers of the issuer from soliciting securities, the solicitation must be an incidental function of their regular duties and the employee or officer must receive no additional compensation. See Banks, *supra*, at 23 (citing Uniform Securities Act 1956 § 402 cmt. (1958)). As discussed below, Matsuyoshi's solicitation of securities was not incidental to her regular duties as an officer of LKM Inc., but in fact, her compensation was directly correlated to her solicitation of securities.

Appellants contended before the circuit court that Matsuyoshi's salary was a "fixed salary, bargained for by Appellants and the [Investors] in [the SP Agreements], which in no way fluctuated with gains, losses, solicitation, advice, market conditions, etc." This contention is without a factual basis. Matsuyoshi's 7% monthly salary was not fixed, rather, it was dependant on Matsuyoshi's solicitation of securities: the more shares of LKM Inc. Matsuyoshi purportedly sold through the SP agreements, the higher her monthly salary. Since all of LKM Inc.'s assets came from Matsuyoshi's sale of corporate stock through the SP Agreements, her salary was directly correlated to her soliciting securities.

Consequently, because at least part of Matsuyoshi's salary constituted remuneration for the solicitation of securities, Appellants were not exempt from the registration requirements of HRS § 485-8. See generally Schultz v. Rector-Phillips-Morse, Inc., 552 S.W.2d 4, 12 (1977) (consulting fees taken from the proceeds of securities sales constituted direct and indirect remuneration, rendering an exemption from securities registration inapplicable). And since Appellants failed to meet their burden, our decision does not reach Appellants' contention that the Commissioner misapplied the doctrine of piercing the corporate veil.

**B. Matsuyoshi violated HRS § 485-14.**

HRS § 485-14(a)(a) provides, in relevant part: "It is unlawful for any person to transact business in this State as a dealer, investment advisor, salesperson, or investment advisor representative unless registered under this chapter." The Final Order concluded Matsuyoshi acted as a salesperson within the meaning of HRS § 485-1(2) (1993).

A salesperson is "any individual other than a dealer who represents a dealer or issuer in effecting or attempting to effect purchases or sales of securities." HRS § 485-1(2). An issuer is "any person who issues or proposes to issue any security", or the person "performing the acts and assuming the duties of depositor or manager pursuant to the provisions of the trust or other agreement or instrument under which the security

8

is issued[.]" HRS § 485-1(8). Appellants' only contention on appeal appears to be that the definition of salesperson is limited to individuals who represent dealers. This contention is contrary to the plain language of § 485-1 and is without merit. LKM Inc. sold securities--corporate stock--through the SP Agreements in a transaction that did not constitute a limited offering. Matsuyoshi signed the SP Agreements on behalf of LKM Inc., the issuer. The Final Order thus correctly concluded:

> Matsuyoshi's active involvement in the sale of the [SP Agreements] through her solicitation and sale constitute the transaction of business involving securities in Hawaii. [Matsuyoshi] acted as a securities salesperson within the meaning of HRS § 485-1(2). [Matsuyoshi] was not a duly registered securities salesperson and was not exempt from registration in violation of HRS § 485-14.

An investment advisor is "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities." HRS § 485-1(6). Matsuyoshi contends the Commissioner clearly erred by concluding Matsuyoshi acted as an investment advisor because "[LKM Inc.] relied on investment advisors in making decisions when trading stock." This contention is without merit because Matsuyoshi acted as an investment advisor to LKM Inc. and the Commissioner's finding was therefore correct.

Matsuyoshi testified the Investors "came onboard because they knew that I was good at picking stocks. I didn't sell them, personally, stocks. I was not a broker. I just bought stocks for the company." Matsuyoshi's testimony continued to confirm her role as a compensated investment advisor to LKM Inc.:

> [Appellee's Counsel:] What is the difference, then, between [LKM, Inc.] and Paulson?
>
> . . . .
>
> [Matsuyoshi:] The way the [LKM Inc.] has [sic] been created was not a broker-dealer. I was never a broker-dealer. I was never an investment adviser. I never advised clients or -- I never advised them on, and I never sold them or bought or sold stocks for them. I bought it

for the company.

. . . .

[Appellee's Counsel:]  And you're making investment decisions from that one account from [LKM Inc.'s Schwab Account]; correct?

[Matsuyoshi:]  Correct.

[Appellee's Counsel:]  And then you're placing these [Investors'] monies who that's all that's in there; correct?

[Matsuyoshi:]  Correct.

. . . .

[Appellee's Counsel:]  the [Schwab Account], 100 percent investors' monies in that account; correct?

[Matsuyoshi:]  They're not investors.  They're shareholder, so –

[Appellee's Counsel:]  They gave you money for investment purposes.  You have to agree to that?

[Matsuyoshi:]     Yes.

[Appellee's Counsel:]  These [Investors] put all their money to you.  You put it in the [Schwab Account].  100 percent of that account is [Investors'] money.  You agree with that?

[Matsuyoshi:]     I agree.

[Appellee's Counsel:]  No other money was in -- your money wasn't in there; correct?

[Matsuyoshi:]     No.

. . . .

[Appellee's Counsel:]  These [Investors'] monies were in there, and that's all that was in there to start?

[Matsuyoshi:]     Yes.

[Appellee's Counsel:]  And you used that money and you invested with that money into all these high technology or quality technology stocks that tanked. Fair statement?

[Matsuyoshi:]     Fair.

. . . .

[Appellee's Counsel:]  I am asking you if you told Charles Schwab how or how much to put in what stock for LKM Matsuyoshi, Inc. -- I'm sorry, [LKM, Inc.]

[Matsuyoshi:]  I'm not quite sure if I fully understand that, but I'll try and answer that.

[Appellee's Counsel:]  If you don't understand it, let me ask you a different question.

[Matsuyoshi:]  okay.

[Appellee's Counsel:] Who told Charles Schwab to buy Apple shares from [LKM, Inc.'s Schwab Account]?

[Matsuyoshi:] I did.

[Appellee's Counsel:] And you received compensation from your [Investors] for making those decisions on their behalf; correct?

. . . .

[Matsuyoshi:] No, I did not.

[Appellee's Counsel:] . . . Your compensation, it says, is a salary and shall be paid regardless of the management's performance; that this salary is 7 percent of [LKM Inc.'s] total equity per month.

[Matsuyoshi:] Correct.

[Appellee's Counsel:] And you would agree that the value of [LKM Inc.] is directly tied to the [Schwab Account] dollar for dollar; correct?

[Matsuyoshi:] It's at Charles Schwab, correct.

[Appellee's Counsel:] No, I asked you if the [LKM, Inc.] value of the corporation and its equity is tied dollar for dollar to that [Schwab Account].

[Matsuyoshi:] Yes.

. . . .

[Appellee's Counsel:] If a million dollars is in [LKM, Inc.] and a million dollars goes to [Schwab Account], the value of [LKM Inc.] is a million dollars; correct?

[Matsuyoshi:] Yes, correct.

. . . .

[Appellee's Counsel:] So every decision you made in the [Schwab Account] directly affected the equity in [LKM Inc.]?

[Matsuyoshi:] Yes.

[Appellee's Counsel:] Every decision that you made to leave stock in there directly affected your shareholders, as you'd like to call them, their equity; correct?

[Matsuyoshi:] Yes.

. . . .

[Appellee's Counsel:] And the only person making those decisions were you?

[Matsuyoshi:] Yes.

[Appellee's Counsel:] Not Charles Schwab?

[Matsuyoshi:] No.

. . . .

[Appellee's Counsel:] And only you received money for making those decisions?

[Matsuyoshi:] Right.

We conclude from Matsuyoshi's testimony that she provided advice to LKM Inc. on the advisability of purchasing and selling securities, for compensation, through her discretionary management over the Schwab Account. We also conclude Matsuyoshi's discretionary management over the Schwab Account constituted advice to the three Investors because she advised the Investors in her former capacity at Paulson, LKM Inc.'s sole purpose was to trade stock, and Matsuyoshi had sole management discretion over the Schwab Account.[8] The Commissioner's finding that Matsuyoshi acted as an investment advisor was proper.

### C. Appellants violated HRS § 485-25(a)(1).

HRS § 485-25(a)(1) makes it unlawful, either directly or indirectly, to "employ any device, scheme, or artifice to defraud" in connection with the offer, sale or purchase of a security. In a "civil enforcement action brought by an agency, a state of mind of at least recklessness must be established to prove a violation of HRS § 485-25(a)(1)[.]" Trivectra v. Ushijima, 112 Hawaiʻi 90, 104, 144 P.3d 1, 15 (2006). Circumstantial evidence is sufficient to establish the requisite state of mind. See id., 112 Hawaiʻi at 105, 144 P.3d at 16.

Here, the violation of HRS § 485-25(a)(1) arises from the SP Agreement and its purported sale of corporate stock. The Commissioner found Appellants made misrepresentations in reckless disregard of the truth by: (1) leading the Investors to believe

_____

[8] Under the present circumstances, we do not recognize advice to the Corporation as distinct from advice to the individual Investors. See generally Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawaiʻi 224, 240-41, 982 P.2d 853, 869-70 (1999) ("The common purpose of statutes providing limited shareholder liability is to offer a valuable incentive to business investment. Although the greatest judicial deference normally is accorded to the separate corporate entity, this entity is still a fiction. Thus, when particular circumstances merit--e.g., when the incentive value of limited liability is outweighed by the competing value of basic fairness to parties dealing with the corporation--courts may look past a corporation's formal existence to hold shareholders or other controlling individuals liable for "corporate" obligations. When a corporation is the mere instrumentality or business conduit of another corporation or person, the corporate form may be disregarded.") (citations omitted).

that their investments would be handled in the same manner as when they had been Matsuyoshi's clients at Paulson and failing to clarify the differences in laymen terms; (2) improperly leveraging the trust from Matsuyoshi's long-term professional relationship with the Investors to deceive them as to the risks of the new enterprises and lead the Investors "to believe that [Matsuyoshi's] past performances would indicate future performances[;]" and (3) failing to disclose the "extreme variation of the compensation schedule from industry norms . . . ." The Commissioner concluded these misrepresentations were made with the requisite intent and induced the Investors to purchase shares in LKM Inc., and thus violated HRS § 485-25(a)(1). Viewing the Commissioner's findings and the entire record in light of Trivectra, we conclude the circuit court correctly affirmed the Final Order.

In Trivectra, the commissioner concluded the respondent made a representation to an investor that was, at a minimum, recklessly made in disregard of the truth. See id., 112 Hawai'i at 105, 144 P.3d at 16. The Hawai'i Supreme Court held "in deference to the trier of fact, we cannot say that it was error for the circuit court to affirm the commissioner's conclusion that [the respondent] acted recklessly with respect to the truth of his representation to [the investor.]" Id. The supreme court concluded "inasmuch as a security was involved in this transaction and the commissioner concluded that a misrepresentation was recklessly made in connection with its sale, the circuit court was correct in affirming the commissioner's conclusion that the Appellants had violated HRS § 485-25(a)(1)." Id.

In the instant case, Appellants provide no ground for this court to assign error to the Commissioner's conclusion. Appellants contend merely that the SP Agreements clearly articulated LKM Inc.'s "legitimate purpose." This appears to reference the purpose listed in LKM Inc.'s Articles of Incorporation: "To engage in the active investment/trading of this organization's resources in various equity investment vehicles such as common stocks, preferred stocks, shares of

partnerships, and other instruments without limitations. This purpose, however, is part of the very misrepresentation the Commissioner found, namely, that Matsuyoshi's transactions with the Investors' money would be the same as it had been at Paulson. As such, the Commissioner did not err by finding Appellants violated HRS § 485-25(a)(1).

**D. Appellants violated HRS § 485-25(a)(2) and (3).**

HRS § 485-25(a)(2) makes it unlawful for any person, in connection with the offer, sale or purchase of a security in Hawaiʻi, either directly or indirectly, to "make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]" HRS § 485-25(a)(3) makes it unlawful for any person, in connection with the offer, sale or purchase of a security in Hawaiʻi, either directly or indirectly, to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]" A state of mind need not be pled or proven in order to establish a violation of HRS § 485-25(a)(2) or (a)(3). See Trivectra, 112 Hawaiʻi at 104, 144 P.3d at 15.

In Trivectra, the commissioner concluded the respondents violated both § 485-25(a)(2) and (3) by omitting the same set of material facts. See Trivectra, 112 Hawaiʻi at 106-07, 144 P.3d at 17-18. There, the respondents marketed a security subject to the Securities Act and failed to inform investors that (1) the software purchased as part of the sale of securities could be obtained by the investors for free and (2) the respondents' use of the software violated an agreement between the respondents and the software company. Id. The commissioner concluded these facts were material because there was "a substantial likelihood that its disclosure would have been considered significant by a reasonable investor." Id. (quoting Basic v. Levinson, 485 U.S. 224, 231 (1988) (internal quotation marks and brackets omitted)). The HawaiʻiSupreme Court of Hawaiʻi affirmed this finding. See Trivectra, 112 Hawaiʻi at 106-07, 144 P.3d at 17-18.

14

In the instant case, Appellants contend the Commissioner erred because he failed to make a finding that Appellants made an "untrue *statement* of material fact or a misleading *statement* containing a material omission as required under HRS § 485-25(a)(2)." This contention is without legal or factual basis. The Commissioner found Appellants, as in Trivectra, omitted material facts that would be of interest to a reasonable investor:

65. The [Appellants] made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of circumstances under which they were made, not misleading in connection with the offer, sale or purchase of the stock purchase agreements:

a. [Matsuyoshi] acted in a manner that conveyed that she would manage investments for the Investors through the company, [LKM Inc.]; and that she would be getting renumeration [sic] based on the performance of her management of investments held by the company. Although she put herself out in this manner, at no point did she register with the Office of the Commissioner;

b. [Appellants] omitted to clearly explain to the Investors the change in investment relationships. [Matsuyoshi] knew that at least two of the Investors were in their 70's and all of them were lay people who had relied on [Matsuyoshi] as their broker-dealer salesperson for years. When she induced them to leave Paulson and become investors in [LKM, Inc.], [Appellants] omitted to explain to them that they would not have the same care and service they had at Paulson and did not explain the risks involved;

c. [Appellants] omitted to tell the Investors that they should not rely on [Matsuyoshi's] past performance as indicative of future performance;

d. [Appellants] told the Investors that their investment monies would purchase Class A Common Stock of [LKM, Inc.] and that they would be issued over one million shares, but no certificates were issued. [Appellants] failed to tell Investors that [LKM, Inc.'s] own corporate business registration filings from 2000 to 2004 indicated no shares of Class A Common Stock were issued;

e. [Appellants] set forth the redemption process in the [SP] Agreement as redeemable on demand within the next business day, but the record shows that Investors' requests for redemption were delayed or denied;

f. [Appellants] omitted to explain how the redemption process worked. Since the records

15

show that [Matsuyoshi] could not understand the calculations herself, it would be impossible for her to have accurately explained it to the Investors;

g.   [Appellants] omitted to explain in detail the justification for the 84% per annum compensation and omitted alerting purchasers that the compensation was markedly higher than standard customary compensation that usually does not exceed 3% per annum. Even if the Investors checked it out themselves with a CPA, the failure to disclose the context of compensation that exceeds the norm to such a marked degree would have had a material effect on the misleading nature of the "salary[;]"

h.   [Appellants] failed to disclose that the stock purchase agreements were "securities" that were required to be registered with the Office of the Commissioner and were not registered or exempt;

i.   [Appellants] failed to disclose that [Matsuyoshi], as the one who made decisions on investments and whose salary was keyed to the management of the assets under management, acted as an investment adviser and/or investment adviser representative to the company; was required to be registered with the Office of the Commissioner; was not registered and was not exempt from registration;

j.   [Appellants] failed to disclose that [Matsuyoshi] in her solicitation of, and sale of shares of the company to, the Investors was [sic] required to be registered with the Office of the Commissioner to transact securities, was not registered as a securities salesperson and was not exempt from registration;

k.   [Appellants] failed to disclose information to the Investors as to where, in what or how their money would actually be invested;

l.   [Appellants] failed to disclose to the Investors that [Matsuyoshi] would treat the [Investors'] funds as a personal account. [Appellants] failed to disclose that approximately $486,000.00 of [Investor] monies would be used to pay [Matsuyoshi's] personal expenses, not as salary checks written to [Matsuyoshi], but rather as a direct account from which [Matsuyoshi] would write checks out to credit cards and other creditors.

The circuit court thus correctly affirmed the Final Order.

**E.   The Commissioner did not violate Appellants' Fourteenth Amendment due process rights.**

Appellants contend their "right to Due Process of Law under the Fourteenth Amendment to the United States Constitution" was violated when the Commissioner allegedly misapplied the

doctrine of Piercing the Corporate Veil "without allowing Appellants notice and a meaningful opportunity to respond, and because said misapplication determined the entire outcome of this case." This contention is without merit. The Commissioner's application of the doctrine was not a determinative factor in Appellants' failure to meet their burden of establishing the limited offering exemption. Regardless of whether the doctrine is applied, Appellants failed to prove that Matsuyoshi did not receive direct or indirect remuneration for soliciting the sale of securities. In any event, Appellees did raise the issue of piercing the corporate veil before the Commissioner by arguing that Appellants never observed corporate formalities and that LKM Inc. was merely a facade. Appellants also had the opportunity to challenge the Commissioner's application of the doctrine in their appeal to the circuit court. As such, this point of error lacks both factual and legal bases.

## IV. CONCLUSION

Accordingly, the "Order Affirming Commissioner's Final Order" and the "Final Judgment," both entered December 18, 2012 in the Circuit Court of the First Circuit are affirmed.

DATED: Honolulu, Hawai'i, February 25, 2014.

On the briefs:

Gary Victor Dubin
Frederick J. Arensmeyer
Richard T. Forrester
for Respondents-Appellants-
Appellants.

Ian Robertson
for Petitioner-Appellee-
Appellee.

Chief Judge

Associate Judge

Associate Judge

17